STATE of Missouri, Respondent,

v.

James E. BEARDSLEY, Appellant.

No. KCD 28420.

Missouri Court of Appeals, Kansas City District.

Feb. 28, 1977.

Motion for Rehearing and/or Transfer Denied April 15, 1977.

Application to Transfer Denied May 10, 1977.

Joe Hamilton Scott, Public Defender, Fifth Judicial Circuit of Missouri, St. Joseph, for appellant.

John C. Danforth, Atty. Gen., David L. Baylard, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., PRITCHARD, C. J., and DIXON, J.

PRITCHARD, Chief Judge.

Upon a finding of the applicability of the Second Offender Act, in accordance with an allegation thereof in the first amended information, and upon a finding by the jury of appellant's guilt, the court sentenced him to 45 years for kidnapping Grace Mein for ransom under Count I, and 10 years for kidnapping for ransom Barbara Cooke, the sentences to run consecutively in the Department of Corrections of Missouri. See § 559.230, RSMo 1969 (as amended, Laws 1972).

In the two points presented it is contended that reversible error was committed (1) in admitting testimony about an assault on two persons in a tavern just prior to the charged kidnapping, upon the ground that it was irrelevant and prejudicial because it constituted evidence of separate uncharged crimes; and (2) that reversible error was committed in admitting the testimony of the victims, Grace and Barbara, that appellant told them he was wanted for armed robbery in Connecticut and New York, and that he had been in prison in Connecticut and was on parole there, and had done burglaries and robberies and had beaten up a dope peddler in New York and had stolen his money, also because it was evidence of separate uncharged crimes and was irrelevant and prejudicial.

The unusual, bizarre facts in this case are these: On January 31, 1975, pursuant to a telephone conversation from Nebraska to the St. Joseph, Missouri, Police Department, officers were to go and arrest a man by the name of James Beardsley, also known as James Brown, whose description was given. Officer Ross, Sergeant Muehlenbacher and Officer Lafever went to the Greyhound Bus Depot in St. Joseph and checked for persons of the given description, and found that a person fitting the description had bought a ticket a few minutes before, and that the bus would be leaving within 15 to 20 minutes for Phoenix, Arizona. Muehlenbacher and Ross proceeded to search the Silver Dollar Tavern nearby, and saw appellant at the front of the tavern bar, close to the door. Appellant identified himself as James Brown, an alias he sometimes used as the officers had been informed. Ross heard shots from the rear of the tavern and ran toward the rear door to assist Lafever, leaving appellant with Muehlenbacher who had placed him under arrest.

As Ross ran to the rear door of the tavern appellant reached into his belt with his left hand and pulled out a blue steel revolver. A scuffle started between Muehlenbacher and appellant, and the officer grabbed his left arm and the revolver, at which time appellant's right arm was free and he reached around to the officer's right side and pulled out his .357 magnum and laid it on the back of the officer's head, then stepped back two or three steps with a gun in each hand. Muehlenbacher tried to talk appellant into going out the front door, at which time a man and a woman, customers of the tavern, walked toward appellant and were "going to try to take him." Appellant stepped up on a landing above the two people, "and he cracked each one of them in the front of the head with the gun and split their heads open and they fell to the floor." Appellant then backed toward the door, turned his back on Muehlenbacher and started to open the door. At that time the lady bartender threw the officer a .22 caliber revolver, which he pointed at appellant, squeezed the trigger, but it misfired. Appellant then went out and walked across the street towards the bus, from which peo-

ple were getting off, and worked his way through the crowd right up onto the bus.

Grace Mein, an 18 year old student, was on the bus going from Maryville to her home in Raytown, and was sitting on its left side about halfway down. Appellant ran down the aisle, sat down beside her and pointed a gun at her side. He pointed to the police car outside and said he was wanted and they were looking for him. He told Grace that he was wanted in New York and Connecticut for armed robbery; he wasn't afraid to use a gun; "that if I didn't (sic) do anything or try to get away he would shoot or kill me." Appellant pulled Grace up and to the back of the bus where there was another girl whom he told to sit down. Appellant sat in the middle, his arms "criss-crossed" with the guns on each of the girls. Officer Tom Johnson came on the bus and appellant told him he wanted a car and $100.00. Johnson got off, appellant became impatient that things were not getting done, and to show he meant business, he yelled out that he was going to blow the girls' brains out. Johnson came back and handed Grace $100.00 and appellant told her to put it in his pocket.

Appellant's brother then came on the bus and told him to give himself up, that is was pointless to go through with it. Appellant responded, " * * * [H]e was through with going to prison and jails, that he didn't want to go back anymore. He could do whatever he wanted to, but he was going to go through with it, that he would rather be shot and killed than ever go back to prison." Appellant then told his brother to leave.

It was arranged that the bus driver drive the bus across the street and around a building so that a car could be driven alongside. The first car that was there driven alongside was not suitable—it was old and not fast enough. It was offered that Johnson would go alone with appellant but it was not acceptable to appellant because he said the girls "were his ticket out", and it was agreed that Johnson's car would be used, and that Johnson would also go along. Appellant told the other girl, Barbara, to get Johnson's gun, which had been placed on a shelf, and that gun was placed in appellant's belt. Holding guns against the heads of Grace and Barbara, the four persons got into Johnson's car, under appellant's threat that he would shoot the girls. Appellant said he was going to keep them until he was safely out of St. Joseph and away from the police, then he would let them go but not until he was safe. They drove around St. Joseph for awhile to get rid of the police then out on some country highway. They drove back into St. Joseph and back out again in a southerly direction toward Kansas City, and at one point Johnson stopped and talked to a policeman in a closely following police car, at which time appellant continued to hold the guns on the girls' heads. They drove on behind a warehouse where Johnson persuaded appellant to let the girls go. They got out of the car and appellant got into the front seat with the guns. The girls walked along a railroad track which paralleled the highway, and a police car came along and picked them up.

The testimony of the other girl, Barbara Cooke, was substantially the same as Grace's. There was no objection made, however, to her testimony about what appellant said about his past criminal life: He had been in prison in Connecticut and was on parole there; he had been on drugs, had done burglaries and robberies and beat up a dope dealer in New York, and stole money from him. The night before in Lincoln he had gotten the drop on the police. Johnson testified also that appellant told him he had been incarcerated or in the penitentiary, also without objection.

After the girls were released, Johnson and appellant drove away, picking up an increasing number of police squad cars with flashing red lights. As they went along, appellant unloaded two weapons, but kept the third loaded and threatened to kill Johnson with it if he tried anything. They met a police roadblock at which Johnson got out thinking he was going to be killed by the officers. Appellant was then dragged from the right side of the car by officers.

 Appellant's cases holding it to be error to admit evidence of other crimes are

to be distinguished. In *State v. Goetz & Martin,* 34 Mo. 85 (1863), there was improper evidence of other *separate* crimes of shoplifting in the area of the one charged. Such also were the facts in *State v. Buxton,* 324 Mo. 78, 22 S.W.2d 635 (1929); *State v. Griffin,* 336 S.W.2d 364 (Mo.1960) and *State v. Spray,* 174 Mo. 569, 74 S.W. 846 (1903). None of these cases had any evidence of other crimes having a logical relation to the ones charged as would come within the here relevant exceptions to the general rule (of inadmissibility of other crimes) in *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304, 307 (Mo. banc 1954), "(1) motive; (2) intent; (3) * * *; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; * * *." Appellant's assault on the two customers in the Silver Dollar Tavern, done immediately prior to the kidnapping, showed his motive to escape arrest, his intent to do so, and his plan to do so, all interrelated and connected to the later crime of kidnapping which was, under the evidence, also done for the purpose of avoiding apprehension. These prior facts were a part of the res gestae of the crime of kidnapping. *State v. Jackson,* 519 S.W.2d 551, 558[19] (Mo.App.1975), and note the factually similar case of *State v. Knighton,* 518 S.W.2d 674 (Mo.App.1975). There a father and son were mortally wounded by pistol shots fired by defendant. Later, in a three person kidnapping for which defendant was charged, he told the victims, " 'I've killed four people in the last two weeks,' and 'I just killed two.' " That he ": 'needed to get away and if [the Jarretts] tried to run or do anything he would kill them and [Traci] would be the first to be killed,' " pointing a pistol at the back of the child's head and asking her parents if they " 'had ever seen what one of these will do?' " He also told them he had committed a robbery in the neighborhood. It was contended on appeal that the evidence concerning the prior shootings was error as being evidence of other crimes. It was held, loc.cit. 518 S.W.2d 679[4], "[I]t is patent that the shootings at the Day residence gave the defendant a motive—to avoid capture and criminal

sanctions for these shootings—to commit the crimes for which he was charged. * * However, motive 'in turn may serve as evidence of the identity of the doer of the crime on charge, or of deliberations, malice, or a specific intent constituting an element of the crime.' " Here, as in the *Knighton* case, the assaults in the tavern not only established appellant's motive to avoid arrest, and thus his subsequent intent to kidnap the two girls to be used as hostages, but a "plan embracing the commission of two or more crimes so related to each other that proof of one tended to establish the other." The assaults and the kidnapping were inextricably related, and were connected both in point of time and circumstances. Appellant's statements to the girls concerning his previous criminal record and activity was not improperly admitted. Those statements, too, bore on his intent to take them as hostages, to put them in fear not to do his bidding, in his attempt to escape arrest. Neither of appellant's contentions have merit under the facts of this case.

The judgment is affirmed.

All concur.